UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

HENRY ALSTON,

       Plaintiff,

v.                                           4:13cv65

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

       Defendant.

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Henry Alston ("Alston") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying his claim for a period of disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act. Specifically, Alston claims the ALJ failed to amend the alleged onset date of disability as he requested, improperly weighed the medical opinion of a treating physician, and improperly assessed his credibility. This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the final decision of the Commissioner be affirmed.

## I.    PROCEDURAL BACKGROUND

Alston filed applications for SSI and DIB, alleging disability beginning June 26, 2007.[1] (R. 167-76). The Commissioner denied his application initially (R. 84-85), and upon reconsideration. (R. 86-107). Alston requested an administrative hearing, which was conducted

---

[1] At the hearing, Alston's attorney orally requested to amend this date to March 25, 2010, but the ALJ did not explicitly acknowledge the request in denying Alston's claim.

1

in Newport News on October 18, 2011. (R. 33-61).

An Administrative Law Judge ("ALJ") concluded that Alston was not disabled within the meaning of the Social Security Act, and denied his claim for benefits. (R. 19-28). The Appeals Council denied review of the ALJ's decision (R. 1-3), thereby making the ALJ's decision the final decision of the Commissioner. Alston then filed this action seeking judicial review of the Commissioner's final decision under 42 U.S.C. § 405(g). This case is now before the Court to resolve the parties' cross-motions for summary judgment.

## II.   FACTUAL BACKGROUND

Born December 30, 1962, Alston is a 5'11" 233-pound male with a high school education. (R. 41, 167, 177). Prior to his alleged onset of disability, Alston worked as a delivery driver for an electronics and appliances company for 21 years. (R. 42-43, 57). He last worked in June 2007 following an injury sustained while moving a television stand upstairs. (R. 42, 43). Apparently, despite his allegations of continued pain, Alston did not seek additional treatment for his symptoms until 2010. (R. 44-45).

Alston's history of work-related pain, however, dates back to December 2004. At that time, he completed a questionnaire for Dr. Thomas C. Markham, M.D., reporting pain and weakness in both legs after carrying a television upstairs while at work. (R. 225). He indicated the pain did not affect his sleeping patterns or typical daily activities, but noted it did affect his ability to complete his job. (R. 226). He also reported an ability to walk just 20 minutes and sit just 15 minutes at a time before the pain required a change in posture. (R. 227). He admitted to smoking and ranked the pain in his legs and back as 8 out of 10, with 10 being the "worst pain I can stand." (R. 228).

Dr. Markham also conducted a physical examination. (R. 235). He noted that, on

2

average, Alston smokes 12 packs of cigarettes per week. Alston was overweight and could move around the room easily and walk repetitively on his heels and toes, though he did complain of back and leg pain with these motions. Id. Gentle palpation anywhere along Alston's spine produced "significant complaints of back pain out of proportion to the pressure applied." Id. Absent any access to Alston's previous medical information, Dr. Markham observed he had "very little to offer," though he did expect "that [Alston] would respond very well to aggressive physical therapy and quite possibly a work hardening program in conjunction with anti-inflammatories." (R. 235-36). Further, Dr. Markham recognized that Alston's job involved heavy lifting and opined that "he [was] not physically capable of doing that" at that time. (R. 236).

At a follow-up appointment a week later on January 7, 2005, Dr. Markham observed no changes in Alston's symptoms. Newly acquired notes from Patient First indicated "mechanical-type low back pain symptoms." (R. 234). At this time, Dr. Markham opted to place Alston in physical therapy for an aggressive exercise program on a daily basis for the ensuing two weeks. He prohibited Alston from bending and lifting anything greater than 25 pounds. Dr. Markham remained concerned "by the complaints and falsity of findings." (R. 234).

Physical therapy treatment throughout the next few months proved helpful, with Alston being cleared for regular duty at work effective March 2005. (R. 229-33). On January 28, 2005, Dr. Markham noted that Alston was "doing dramatically better." (R. 233). By February 18, 2005, Alston himself reported an ability to return to regular duty at work by February 25, 2005. (R. 232). Alston went back to physical therapy following the February 18 appointment, however, and on March 25, 2005, Dr. Markham noted Alston "moves very well," and agreed to let him return to work the following week. (R. 231). At an April 15, 2005 appointment, Dr.

Markham observed that Alston was back to regular duty at work, despite some aching in his back. (R. 230). At a final appointment on June 3, 2005, Dr. Markham indicated that Alston was "doing much better." He was taking no medication, moved quite well, and had no tenderness in his back. He was allowed to continue working regular duty. (R. 229).

Alston presented two years later to a Patient First facility in Newport News, complaining of injuring his lower back while at work. (R. 242). He denied any midline tenderness, bowel or bladder dysfunction, paresthesias, or changes in strength or sensation. Id. He appeared well-developed and well-nourished and had good lateral movement and extension. Id. His straight-leg raise was negative and he could flex his back 30 degrees before his movement was limited by pain. Id. Additionally, he had "a lot of paraspinous muscle spasm from L3 to S1 with pain to palpation." Id. He ambulated slowly and appeared "a little hunched over." Id. Alston was ultimately diagnosed with a lumbar sprain and was given pain medication. Id.

At a follow-up on July 6, 2007, Alston reported decreased back pain with his medications. (R. 243). He also explained, however, that after doing some yard work to test the condition of his back, the pain and spasms returned. A physical exam revealed little change, though there were slightly less muscle spasms occurring in his right lower back. His medications were refilled and he was told to follow up with orthopaedics. Id. Alston, however, came back to Patient First on July 20, 2007 complaining that it had taken him almost 2 weeks to set an appointment with an orthopaedic doctor. He indicated he was running out of his medications again and needed a refill. As it was verified that Alston did have an appointment scheduled with Dr. Markham, he was given refills of his medications until that date. (R. 244). Alston returned for a third follow-up on August 22, 2007 seeking more refills. (R. 245). He was given a refill of Motrin, and was instructed that so long as he was under the care of Dr. Markham, follow-up

appointments and medication refills should be obtained through that office.

A July 27, 2007 letter from Dr. Markham indicated Alston had remained out of work since June 26, 2007, when he injured his back while lifting a table at work. (R. 246). Dr. Markham recalled treating him for similar complaints several years prior, noting that "with physical therapy we were able to get him back to work." (R. 246). Alston was in "excellent health," having lost 17 pounds since his last visit with Dr. Markham. He complained, however, of significant pain with palpation anywhere on his lower spine and with any motion, though he was able to walk into a room normally. When asked to walk on his heels or toes, he did so "with a very bizarre gait." Id. He had normal strength otherwise, and pain films of his back were unremarkable. Dr. Markham considered Alston to be "very poorly conditioned," with "at most a mild musculoskeletal strain." Id. He placed Alston on light duty at work with no lifting of more than 20 pounds, and instituted daily physical therapy and exercise. Again, as was the case during his previous treatment, Dr. Markham was "concerned that his complaints seem to be out of proportion to physical findings." (R. 247).

Alston returned to Dr. Markham's office on August 10, 2007. He had not returned to work since his previous visit as no light duty was apparently available. (R. 256). He had not started physical therapy, either, as he could not afford driving to and from Hampton for the appointments. Considering the fact that it was a "significant financial burden" for Alston to drive to Hampton for physical therapy or for visits with Dr. Markham, Dr. Markham determined it would be in Alston's best interest to switch to a physician closer to his home. He continued in his belief that Alston "has a mild musculoskeletal strain that should respond quite well to an aggressive conditioning program." Id.

Notwithstanding this, Alston returned to Dr. Markham's office again on September 26,

5

2007 at the request of his newly approved physical therapist. (R. 258). Alston explained he was doing much better with the therapy. Indeed, Dr. Markham noted that Alston's back range of motion had markedly improved, as he was now able to forward flex and touch his toes. Id.

Following his 2007 visit to Dr. Markham, there is a gap in Alston's medical record before the ALJ. Several years later, on April 15, 2010, Alston visited Dr. Concepcion S. Aspili, M.D. for an "evaluation for low back pain since 2007 when he injured his back carrying a TV stand at work." (R. 275). Alston reported no new injury, but described "on and off" pain that radiated to his right lower leg, with numbness in his foot. Id. On exam, Alston could bend his back 90 degrees without difficulty, had 5/5 motor strength in his upper and lower extremities, and was alert and oriented. Dr. Aspili continued Alston's medications and scheduled a follow-up appointment after two weeks. In May 2010, Alston claimed his back pain was improving with medication, but he reported right knee swelling without any sort of trauma. (R. 278). An MRI of Alston's spine revealed moderate spinal stenosis with disc herniation at L4-L5, and moderate soft tissue stenosis at L5-S1 due to epidural fat deposition. (R. 288, 293). X-Rays of his right knee showed mild osteoarthritis with small joint effusion. (R. 289).

On August 31, 2010, Dr. David Lorenzo issued a medical opinion evaluating Alston's physical ability to do work-related activities. (R. 305-06).[2] Dr. Lorenzo found that due to Alston's chronic lower back and right knee pain, hypertension, and obesity, he was capable of lifting and carrying 20 pounds occasionally and 10 pounds frequently. (R. 305). Further, he was able to stand and walk approximately 2 hours and sit for about 6 hours in an 8-hour day. Id. Moreover, Alston would need to take unscheduled breaks during his work shift every 2 hours. Id. He could occasionally twist, stoop, crouch, climb stairs and ladders, and the only physical

---

[2] The August 2010 disability opinion appears to be the earliest record of Alston consulting Dr. Lorenzo. Although Dr. Lorenzo continued to treat him thereafter, and issued a similar opinion the following year, it is not clear if, or how long Dr. Lorenzo treated Alston before the 2010 opinion.

function affected by his impairments was his ability to push or pull. (R. 306). Lastly, he needed to avoid all exposure to extreme cold or heat, wetness, humidity, and hazards (machinery, heights, etc.). Id.

In February 2011, Alston presented to Dr. Lorenzo with back pain. (R. 312). He appeared alert and oriented with spine tenderness. He was positive for straight leg raising on the right and his right knee was slightly tender with no swelling. Id. Dr. Lorenzo continued the dosage of Neurontin for Alston's back pain. Id. Follow-up records through September 1, 2011 indicate no change in Alston's physical condition and a continued use of medications, with an increase in the dosage of Neurontin prescribed in April 2011. (R. 310, 316). Dr. Lorenzo drafted another opinion regarding Alston's ability to do physical work-related activities on September 23, 2011. (322-23). In it, Dr. Lorenzo limited Alston's ability to lift and carry on a frequent basis to less than 10 pounds, and his ability to stand and walk during an 8-hr day to less than 2 hours. (R. 322). Additionally, Dr. Lorenzo decreased Alston's environmental restrictions to "avoid even moderate exposure" from "avoid all exposure." (R. 323). Everything else was identical to his 2010 opinion.

In October 2011, Alston complained of bilateral knee pain going into his foot, right worse than left. (R. 325). Dr. Kerry L. Loveland, an attending physician, observed that Alston was alert and oriented, and in no acute distress. (R. 326). Dr. Loveland also noted that Alston smoked approximately 15 cigarettes a day and drinks a 6-pack of alcohol each week. An examination of his knees revealed no knee effusions. He also had no tenderness to palpation. While strength testing in the right leg indicated a weakness in the L3, 4, and 5 nerve distributions, he had normal sensation bilaterally and examination of the left knee was "completely normal." Id. Dr. Loveland reviewed images of both knees and observed a possible

7

osteochondral defect in the lateral femoral condyle of the left knee but "otherwise they were unremarkable." Id. Ultimately, Dr. Loveland believed the pain Alston reported in his feet was not related to his knees, but more likely associated with his back issues. She recommended epidural injections by his primary care physician, but had nothing else to offer. Id.

In addition to records from treating physicians, the ALJ considered two medical source statements from agency physicians. On June 2, 2010, Leopold Moreno, M.D., reviewed the medical evidence of record and assessed Alston's residual functional capacity. (R. 73-83). Dr. Moreno evaluated the submitted medical evidence from June 2007 through May 2010, observing a general decrease in Alston's impairments. For example, in June 2007, Dr. Moreno noted that Alston had pain with any motion and a bizarre gait when walking on his heels and toes. At the time, his complaints seemed out of proportion to the physical findings. Indeed, by September 2007, Alston's back range of motion was "dramatically better." While Alston continued to complain of back pain in 2010, Dr. Moreno noted he could flex his back 90 degrees without difficult, his back pain was improving with medication, and his knees were not tender. (R. 76).

Dr. Moreno considered Alston's statements regarding his symptoms to be partially credible as the evidence to-date indicated that while Alston had treated for back pain, he had virtually no other physical limitations. (R. 77). He also reported an ability to mow the lawn and vacuum the house twice a week. Given all of this evidence, Dr. Moreno considered Alston capable of performing the exertional requirements of medium work, but was limited in his ability to climb ropes, ladders, or scaffolds. (R. 79-80).

On December 6, 2010, Tony Constant, M.D., another state agency physician, reviewed Alston's updated medical records through October 2, 2010, including an MRI and Dr. Markham's medical opinion from July 27, 2010. (R. 87-89). Among other things, Dr. Constant

8

noted that Alston had moderate spinal stenosis that caused back pain that radiated down his right leg, but he was able to ambulate without an assistive device, would have limitations bending and kneeling, and would have pain lifting anything over 20 pounds. (R. 90). He, too, considered Alston's statements regarding his symptoms partially credible for the same reasons explained by Dr. Moreno – namely because the medical evidence and Alston's own daily activities revealed no other physical limitation beyond back pain. In fact, he had full range of motion of his spine, a normal gait, and no difficulty in using his hands. Accordingly, Dr. Constant determined Alston was capable of performing the exertional requirements of light work, with further limitations in his ability to climb ramps, ladders, ropes, scaffolds or stairs, stooping, kneeling, crouching, and crawling. (R. 90-92).

For his part, Alston testified during his October 2011 hearing that on an average day he was slow getting up in the morning and usually took his medication around 8:00 or 9:00 a.m. (R. 50). Alston would go back to sleep, waking up again around 2:00 or 3:00 p.m. to take more medication. He explained that while he was living with his wife,[3] he occasionally cooked and vacuumed. Id. Other than watching approximately two hours of television during the day, Alston had no hobbies. (R. 50-51). He read no books, was not a member of any club or organization, and engaged in no regular social activity with his wife or otherwise. (R. 51). He is capable of driving, and he reported smoking about 15 cigarettes daily and drinking a six-pack of alcohol weekly. (R. 42, 53).

Finally, the ALJ also heard from a vocational expert (the "VE"). (R. 57-60). The VE described Alston's prior employment as a delivery driver for electronics and appliances as heavy, semi-skilled labor. (R. 57). The ALJ asked the VE to assume a hypothetical individual who

---

[3] At the time of the Hearing, Alston and his wife were separated and he was reportedly homeless, "bouncing between houses." (R. 39).

shared Alston's age, education and work background. Id. The VE was to assume further that this individual could lift, carry, push, or pull up to 20 pounds occasionally and 10 pounds frequently; could stand and walk 4 hours in an 8-hour day and sit 6 hours in an 8-hour day, though could stand and walk no more than 15-30 minutes at a time before sitting; needed to avoid climbing, ropes and scaffolds, crawling or kneeling, but could perform other postural movements occasionally; and needed to avoid working around any hazards. Id. at 57-58. Such an individual, the VE opined, could not perform Alston's past work. Id. at 58. However, that individual could perform other jobs in the national economy, including cashier (light level), unskilled office clerk, and surveillance system monitor (both at the sedentary level). Id. If an individual was absent from work more than three times per month, though, these jobs would be unavailable. Id. at 59. Further, if the individual could stand and walk for 2 hours and sit for 6 hours in an 8-hour day, these jobs could be performed. Id.

## III.    STANDARD OF REVIEW

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam); Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility

determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV.   ANALYSIS

To qualify for disability insurance benefits under sections 416(i) and 423 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under age sixty-five, file an application for disability insurance benefits and a period of disability, and be under a "disability" as defined in the Act.

The Social Security Regulations define "disability" as the:

> Inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, a claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. The

Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The five questions which the ALJ must answer are:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from doing any other work?

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. This analysis is set forth in 20 C.F.R. §§ 404.1520 and 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

A.     **The ALJ's Decision**

In this case, after first finding that Alston met the insured status requirements of the Social Security Act through December 31, 2012, the ALJ made the following findings under the five part analysis: (1) Alston has not engaged in substantial gainful activity since his alleged onset date of June 26, 2007; (2) he had severe impairments of back and knee disorders; (3) he did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in Appendix 1; (4) Alston was unable to perform his past relevant work, but did have the RFC to lift, carry, push and pull up to 20 pounds occasionally and 10 pounds frequently; to stand or walk for about 4 hours and sit 6 hours within an 8-hour day, but could not stand or walk for longer than 15-30 minutes before sitting; could perform work activities that allow him to avoid kneeling, crawling, climbing ropes or ladders, and hazards; and (5) considering Alston's age, education, work experience, and residual functional capacity, jobs exist in significant numbers in the national economy that Alston can perform. (R. 21-26).

Alston now argues the ALJ erred in determining his RFC. Specifically, he claims the ALJ: (1) improperly evaluated the medical evidence and (2) did not support with substantial evidence his finding that Alston's testimony was "not credible." Additionally, Alston contends the ALJ inappropriately failed to amend Alston's alleged onset date of disability as requested. The Court considers each argument below.

B.     **The ALJ's failure to amend Alston's alleged onset date of disability was harmless error.**

As an initial matter, Alston alleges the ALJ erred by failing to accommodate his request to amend the alleged onset date of disability. (ECF No. 12 at 13). During his hearing, Alston's counsel informed the ALJ that Alston wished to amend his alleged onset date to March 25, 2010, as opposed to the listed date of June 26, 2007. Id. By failing to do so, Alston argues, the ALJ

relied on old evidence in reaching his decision, a mistake that "warrants remand for an accurate statement of the facts and a consideration of evidence from the proper time frame in reaching a decision in the claim." Id. at 14.

A review of the ALJ's opinion, however, reveals that he considered all of the medical evidence bearing on Alston's allegedly disabling condition, including the post-March 25, 2010 medical evidence Alston has focused on. Because the ALJ is entitled to "consider all evidence" when making a disability decision, see e.g., 20 C.F.R. §§ 404.1512(b)(2), 404.1520(a)(3), and because the ALJ's decision indicates that he considered whether Alston was under a disability from June 26, 2007 through the date of his decision, the undersigned finds any error in the ALJ's failure to amend the alleged onset date of disability at Alston's request was harmless. Alston has not demonstrated that consideration of a greater period of time renders the ALJ's decision unsupported.

## C. The ALJ properly evaluated the evidence bearing on Alston's RFC.

Alston contends that the ALJ erred in determining his RFC, which is defined as the plaintiff's maximum ability to work despite his impairments. 20 C.F.R. § 404.1545(a)(1); see SSR 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis."). When a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must then determine the plaintiff's RFC. 20 C.F.R. § 404.1520(e). After doing so, the ALJ uses that RFC at step four of the sequential analysis to determine whether the plaintiff can perform his past relevant work. Id. at § 404.1545(a)(5)(i). If it is determined that the plaintiff cannot perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy. Id. at

404.1545(a)(5)(ii).

At the administrative hearing level, the ALJ alone has the responsibility of determining RFC. Id. at § 1546(c). RFC is determined by considering all the relevant medical and other evidence[4] in the record. Id. at §§ 404.1545(a)(3) and 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.). In this case, the ALJ found that Alston has the RFC to perform light work with the added limitations listed previously.

### a. The ALJ properly explained the weight assigned to all medical source statements.

Alston first contends that the ALJ erred by improperly considering and evaluating the evidence, including the medical source statement submitted by his treating physician, Dr. Lorenzo. (ECF No. 12 at 14-19). Specifically, Alston contends the ALJ improperly gave little weight to Dr. Lorenzo's medical opinion. (ECF No. 12 at 15).

As stated previously, the ALJ alone has the responsibility of determining RFC. In doing so, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider the following factors: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. 20 C.F.R. § 404.1527.

---

[4] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work. 20 C.F.R. § 404.1529(a).

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical source. Id. at § 404.1527(d)(1)-(2). A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at § 404.1527(d)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig, 76 F.3d at 590.

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2P, 1996 WL 374188, at *5 (S.S.A.). When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision. Id. at § 404.1527(d)(2).[5]

Here, the ALJ found that Dr. Lorenzo's findings that Alston could stand and walk for 2 hours in an 8-hour day, could lift less than 10 pounds frequently, should avoid all exposure to extreme temperatures, wetness, and humidity, and that he would miss more than three days of work each month were entitled to little weight. In doing so, he explained that these findings were inconsistent with Dr. Lorenzo's own examinations of Alston, as well as examinations conducted by other physicians. The ALJ also observed that Dr. Lorenzo's findings deviated from "the test results [and] with the documented improvement in the claimant's pain with the use of medications." (R. 26).

After reviewing the complete record and the ALJ's analysis, the undersigned finds no

---

[5] In fact, under the applicable regulations, the ALJ is required to "explain" in his decision the weight accorded to all opinions – treating sources, nontreating sources, state agency consultants, and other nonexamining sources. 20 C.F.R. § 404.1527(f)(2)(ii).

error in the weight assigned to Dr. Lorenzo's medical source opinion.  To begin with, the statement Alston relies upon is not a medical record prepared as part of Dr. Lorenzo's treatment, but a check-the-box form prepared solely to support his claim of disability.  It contains no space for elaboration on the reasons for Alston's claimed limitations.  Such check-the-box forms, unaccompanied by explanations are weak evidence at best, and not entitled to great weight even when completed by a treating physician.  McConnell v. Colvin, 2:12cv5, 2013 WL 1197091, at *6 (W.D. Va. Mar. 25, 2013) (citing Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993)).

Here, as the ALJ noted, Alston's medical records document a history of chronic, but manageable lower back pain.  Alston first injured his back in 2004 after carrying a 36" television upstairs.  This initial injury responded well to physical therapy and medication, and no records indicate that Alston had any other problems until June 2007, when he injured his back once more while moving a table at work.  Over the ensuing months, he again responded well to physical therapy, and Alston's records indicate he did not seek medical treatment again until April 2010.[6] At that time, Alston was diagnosed with a backache, not otherwise specified, and was found to have moderate spinal stenosis, but displayed an ability to flex his back 90 degrees with full motor strength in his arms and legs.

In February 2011, Alston presented to Dr. Lorenzo complaining of moderate to severe lumbar pain.  Dr. Lorenzo noted Alston had spine tenderness, a positive straight leg raising test on the right, and a slightly tender right knee.  After assessing low back pain, hypertension, knee pain, and rhinitis, Dr. Lorenzo continued Alston on a conservative medication-treatment plan. (R. 312-13).  During two separate follow-up appointments, Dr. Lorenzo made similar physical findings, though he did slightly increase Alston's prescription for Neurontin (for back pain).  Id.

---

[6] At his hearing, Alston testified to an inability to afford treatment in 2008 and 2009, only becoming aware of the free clinic option in 2010. Additionally, Alston's wife did not include him on her health insurance policy during this period. (R. 44-46).

Prior to these appointments, Dr. Lorenzo completed a check-the-box form for Alston on August 31, 2010, assessing Alston's ability to perform physical work-related activities.  (R. 305-06).  Among other things, and as discussed previously, Dr. Lorenzo deemed Alston capable of lifting 20 pounds occasionally, 10 pounds frequently, and standing and walking for 2 hours and sitting for 6 hours in an 8-hour day.  He needed to avoid all exposure to extreme cold, heat, wetness, humidity, or other hazardous conditions, and would require more than three absences from work each month.  Id.

Dr. Lorenzo provided a slightly more restrictive assessment of Alston's ability to perform physical work-related activities on a second check-the-box form completed in September 2011.  (R. 322-23).  Specifically, Dr. Lorenzo indicated that Alston was capable of frequently carrying less than 10 pounds, could stand and walk less than 2 hours in an 8-hour day, was limited in his ability to push and pull because it could worsen his back pain, and he needed to avoid concentrated exposure of noise.[7]  Again, Dr. Lorenzo repeated that Alston would need regular unscheduled breaks and could potentially be absent from work more than three times each month, but he did not offer any explanation for his conclusion that Alston's moderate back problems would lead to excessive absence from any employment.  Id. at 323.

Although Dr. Lorenzo provided cursory explanations for some of his findings, these were not expanded upon in any detail and were limited to "low back pain" and that exertion "can worsen his back pain."  (R. 306, 323).  Under these circumstances, the ALJ's carefully-explained decision to afford Dr. Lorenzo's statement on disability little weight is supported by substantial evidence.

Alston also criticizes the ALJ's decision to give significant weight to Dr. Constant's

---

[7] Dr. Lorenzo also adjusted Alston's environmental restrictions upward, indicating that rather than avoiding "all exposure" to extreme cold and heat, wetness, humidity, and hazards, he now should avoid "even moderate exposure" to those same conditions.  (R. 306, 323).

medical opinion.  According to Alston, Dr. Constant, a non-examining DDS medical consultant, referenced Dr. Markham's 2007 medical opinion in rendering his decision.  Alston complains that the ALJ did not give a "justifiable reason for giving more weight to a non-treating non-examining DDS consultant physician" who based his decision on an opinion dated "three years prior to the amended alleged onset date of disability."  (ECF No. 12 at 19).

A claimant's RFC is determined by considering all the relevant medical and other evidence in the record and the weight assigned to an opinion is in part determined by how consistent it is with the medical record.  "Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs," the ALJ is required to consider their factual determinations about the "nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists."  SSR 96-6p.  While the ALJ is not bound by these findings, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions."  Id. The opinion of a non-examining, non-treating physician, in turn, can be relied upon when the opinion is consistent with the record.  Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984). Additionally, "[w]hen the record contains a number of different medical opinions, including those from the Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence." Armentrout v. Astrue, 3:10CV504, 2011 WL 4625931, at *4 (E.D. Va. June 2, 2011), report and recommendation adopted, 3:10CV504, 2011 WL 4625912 (E.D. Va. Oct. 3, 2011).

Here, the ALJ gave Dr. Constant's opinion that Alston could perform light work activities "significant weight" because "it is consistent with the objective findings from physical examinations, with the test results and with the documented improvement in the claimant's pain

with the use of medications." (R. 26).   This finding actually favored Alston, as the ALJ expressly rejected Dr. Moreno's opinion that Alston could perform medium work, giving that opinion little weight.   Dr. Moreno's opinion, the ALJ concluded, "is not supported by the medical evidence establishing mild to moderate back and knee pain, which would preclude the claimant from lifting as much as 50 pounds." (R. 25-26).   Moreover, the 2007 evidence coincides with Alston's original alleged onset date and the last reported injury he claims produced his disability.   Thus, it is clear that the ALJ considered all of the medical evidence, and properly explained the weight afforded this evidence.   Importantly, Alston points to no medical evidence, objective or otherwise, that suggests exertional limitations greater than those imposed by his light RFC with the additional limitations outlined above.

**b.   The ALJ correctly evaluated Alston's complaints of pain.**

Alston next argues that the ALJ erred in finding his complaints of disabling limitations inconsistent with the medical record. (ECF No. 12 at 19-21).   The ALJ specifically found that, while Alston's medically determinable impairments could reasonably be expected to cause the symptoms alleged, Alston's own statements concerning the "intensity, persistence and limiting effects of these symptoms are not entirely credible to the extent they are inconsistent with the . . . residual functional capacity assessment." (R. 25).

In deciding whether a plaintiff is disabled, the ALJ must consider all symptoms, including pain, and the extent to which such symptoms can reasonably be accepted as consistent with the objective evidence. 20 C.F.R. § 404.1529(a).   A plaintiff's subjective statements about pain or other symptoms alone are not enough to establish disability. Id. Under both federal regulations and Fourth Circuit precedent, determining whether a person is disabled by pain or other symptoms is a two-step process. First, the plaintiff must satisfy a threshold obligation of

showing by objective medical evidence a medical impairment reasonably likely to cause the symptoms claimed. 20 C.F.R. § 404.1529(b); Craig, 76 F.3d at 594-95. "However, while a claimant must show by objective evidence the existence of an underlying impairment that could cause the pain alleged, 'there need not be objective evidence of the pain itself.'" Craig, 76 F.3d at 592-93 (quoting Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir. 1986)).

After the plaintiff has satisfied the first step, the ALJ must evaluate the intensity and persistence of the plaintiff's symptoms and the extent to which they affect his ability to work. 20 C.F.R. § 404.1529(c)(1). In making this evaluation, the ALJ must consider "all the available evidence," including: (1) the plaintiff's history, including his own statements, id.; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption," id. at § 404.1529(c)(2); and (3) other evidence submitted by the plaintiff relevant to the severity of the impairment such as evidence of daily activities, medical treatments and medications, and descriptions of the pain or other symptoms, id. at § 404.1529(c)(3).

In evaluating the intensity and persistence of the plaintiff's symptoms and the extent to which they affect his ability to work, the ALJ must consider whether inconsistencies exist and the extent to which there is conflict between the plaintiff's statements and the other evidence. Id. at § 404.1529(c)(4). According to the regulations, a plaintiff's "symptoms, including pain, will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." Id.

Although Alston satisfied his initial burden under the two-step inquiry set forth in the

regulations and adopted by the Fourth Circuit, the ALJ found that while his medically determinable impairments "could reasonably be expected to cause the alleged symptoms," Alston's own statements regarding the "intensity, persistence and limiting effects of these symptoms are not entirely credible . . . ." (R. 25). In so finding, the ALJ considered the entire record and documented his review in detail in the opinion. He specifically observed that Alston's allegation of "disabling" pain is inconsistent with "the mild to moderate test results, with the findings from physical examinations, (including normal muscle strength, a normal gait and normal sensation), or with the documented improvement in his pain with the use of medications." Id. Alston required "only conservative treatment" and the medical record does not document regular complaints of adverse side effects from the use of medications. Ultimately, the ALJ determined that Alston's "reported restrictions in daily activities are out of proportion to the conservative course of treatment he has required, to the findings from physical examinations and to the test results." Id. In so holding, the ALJ complied with both the regulations and Fourth Circuit precedent in evaluating Alston's testimony, and supported his decision with substantial evidence.

To the extent Alston contends that the ALJ erred in evaluating his credibility, the Court must give great deference to the ALJ's credibility determinations. Eldeco, Inc. v. NLRB, 132 F.3d 1007, 1011 (4th Cir. 1997). "When factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstance.'" Id. (quoting NRLB v. Air Prods. & Chems., Inc., 717 F.2d 141, 145 (4th Cir. 1983)). The Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" Id. (quoting NRLB v. McCullough Envtl. Servs., Inc., 5 F.3d 923, 928 (5th Cir. 1993)).

Here, the ALJ performed the required analysis and articulated a number of reasons for not fully crediting Alston's statements. There is ample objective evidence in the Record to contradict Alston's self-report of disabling limitations and to support the ALJ's credibility determination. Accordingly, the Court finds the ALJ properly evaluated Alston's credibility.

## V.      RECOMMENDATION

For the foregoing reasons, the undersigned recommends that the Court GRANT the Commissioner's motion for summary judgment (ECF No. 13), DENY Alston's motion for summary judgment (ECF No. 11), and affirm the final decision of the Commissioner.

## VI.      REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.      Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.      A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
February 14, 2014